1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ELTON ACKERSON,                          No.  2:21-cv-2205 WBS KJN P

12                        Plaintiff,

13           v.                                ORDER AND FINDINGS AND
                                               RECOMMENDATIONS
14    ELLIOTT, et al.,

15                        Defendants.

16

17          Plaintiff is a state prisoner, appearing pro se and in forma pauperis, in this civil rights

18    action pursuant to 42 U.S.C. § 1983.  This matter was referred to a United States Magistrate

19    Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302.  This action proceeds on

20    plaintiff's Eighth Amendment claims against defendants Sgt. Cuneo, Deputy Elliott, and Deputy

21    Hill, all employed at the Sacramento County Main Jail.  Defendants' fully briefed motion for

22    summary judgment is before the court.  As discussed below, the undersigned recommends that

23    defendants' motion be granted.

24    I.  Plaintiff's Amended Complaint

25          In his verified pleading, plaintiff alleges the following.  On January 6, 2021, defendant

26    Cuneo violated plaintiff's Eighth Amendment rights by failing to protect plaintiff from harm by

27    opening plaintiff's cell door and deliberately creating a physical encounter with deputies,

28    endangering plaintiff's life.  (ECF No. 14.)  The CERT team rushed in, knocking plaintiff to the

                                               1

1   ground, and causing his mouthpiece to become dislodged.  After plaintiff was handcuffed,

2   plaintiff was pinned on the ground and unable to move as Deputy Arcineda held plaintiff down,

3   Deputy Elliot began punching plaintiff in the face and head while Deputy Hill tased plaintiff

4   multiple times, causing plaintiff great pain, physical injury, muscle spasms, burned scar tissue

5   from being tased, anxiety, stress, depression, and emotional mental suffering.  (ECF No. 14 at 3.)

6   Plaintiff names as defendants Sgt. Cuneo and Deputies Elliott and Hill, now known as Deputy

7   Butymhill.

8   II.  Background

9        Defendants' motion for summary judgment was filed on April 27, 2023.  (ECF No. 41.)

10   Plaintiff filed an opposition, and defendants filed a reply.  (ECF Nos. 44, 45.)

11       Subsequently, plaintiff filed a motion to reopen discovery, which was denied as untimely, but

12   leave was granted to allow plaintiff an opportunity to view available video footage, including footage

13   submitted by defendants in support of their motion.  Plaintiff was provided an opportunity to file an

14   amended opposition after viewing the video footage.  However, because the incident took place in

15   plaintiff's cell, there was no video footage of the incident, and plaintiff declined the opportunity to

16   view the video footage taken after the incident which defendants submitted in support of their motion.

17       On December 11, 2023, plaintiff was ordered to show cause why the motion should not be

18   submitted for decision.  (ECF No. 52.)  That same day, plaintiff filed an amended opposition.

19   (ECF No. 53.)  Defendants filed a response.  (ECF No. 54.)

20       On January 12, 2024, plaintiff filed a third opposition to the motion for summary judgment.

21   (ECF No. 59.)  However, at that time, the motion was fully briefed and submitted for decision.

22   Therefore, plaintiff's unauthorized third opposition is disregarded and stricken from the record.

23   III.  Legal Standard for Summary Judgment

24       Summary judgment is appropriate when it is demonstrated that the standard set forth in

25   Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

26   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

27   judgment as a matter of law."  Fed. R. Civ. P. 56(a).

28   ////

> Under summary judgment practice, the moving party always bears
> the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

3

1    a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

2    (9th Cir. 1987).

3         In the endeavor to establish the existence of a factual dispute, the opposing party need not

4    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

5    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6    trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

7    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

8    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

9    amendments).

10        In resolving a summary judgment motion, the court examines the pleadings, depositions,

11   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

12   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

13   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

14   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

15   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

16   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

17   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

18   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

19   some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

20   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

21   trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

22        By contemporaneous notice filed April 27, 2023 (ECF No. 41-1), plaintiff was advised of

23   the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil

24   Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

25   Eikenberry, 849 F.2d 409 (9th Cir. 1988).

26   ////

27   ////

28   ////

4

IV.  <u>Undisputed Facts</u>[1] ("UDF")

     1.  On January 6, 2021, the Sheriff's Department's Custody Emergency Response Team (C.E.R.T.) conducted a large-scale search and cell inspection on the fifth floor of the Main Jail.  (Decl. Elliott, ¶ 5; Decl. Butymhill, ¶ 4.)

     2.  Staff had acquired information as to the existence of a homemade weapon in the jail, and the C.E.R.T. team was tasked with conducting a shakedown to locate the weapon.  The C.E.R.T. team received intel that a shank was somewhere within the 300 pod of 5 East.  (Decl. Cuneo, ¶ 4; Decl. Elliott, ¶ 6.)

     3.  On that date, Sgt. Cuneo was assigned to the Sacramento County Main Jail as a Booking Sergeant and as Custody Emergency Response Team Sergeant.  (Decl. Cuneo, ¶ 3.)

     4.  The C.E.R.T. team first met in the conference room on the second floor for briefing, to discuss details regarding the shakedown, the cell assignments for searching, and what contraband to look for.  During this operation briefing, deputies were instructed that they were looking for a "shank" on the fifth floor, an unlawful weapon made by inmates.  (Decl. Elliott, ¶ 5; Decl. Cuneo, ¶ 6.)

     5.  The search and cell inspections in the 300 pod of 5 East were necessary for the safety and security of the institution, including the safety and security of staff and inmates.  (Decl. Cuneo, ¶ 7; Decl. Elliott, ¶ 7.)

     6.  C.E.R.T. shakedowns to search for weapons in the jail are carried out methodically, quickly, and with as much confidentiality as possible.  (Decl. Cuneo, ¶ 8; Decl. Elliott, ¶ 8.)

     7.  Ideally, the inmates are taken by surprise when their cell is searched.  When inmates become aware that a search of their cell is imminent, they will destroy the contraband or dispose of it by flushing it down the toilet for example.  (Decl. Cuneo, ¶ 8; Decl. Elliott, ¶ 8.)

     8.  When Sgt. Cuneo supervises a unit search, he feels it is important to prevent inmates from observing staff's search tactics.  Personal items are taken out of the cells into the common area and searched by staff.  The methods of searching are to be kept confidential and screened

---

[1]  For purposes of summary judgment, the undersigned finds these facts are undisputed.

from the view of inmates looking out of their cell windows.  Sgt. Cuneo tries to prevent alerting inmates from learning where they should and should not hide contraband such as weapons.  The element of surprise is an important component of the operation.  (Decl. Cuneo, ¶ 9.)

9.  When conducting a cell search in a C.E.R.T. shakedown, the practice is to instruct the inmate to comply with handcuffing.  The inmate is then removed from the cell and taken to another room while the search of his cell is being conducted.  (Decl. Cuneo, ¶ 10.)

10.  In Sgt. Cuneo's experience, when an inmate resists these instructions or is combative, this suggests that he is hiding contraband.  When the search is for a known weapon, an inmate who is not compliant poses a threat to the safety and security of staff and inmates.  (Decl. Cuneo, ¶ 10.)

11.  When conducting a cell search in a C.E.R.T. shakedown, Deputy Elliott was trained to instruct the inmate to face away from him and to put his hands behind him for handcuffing. (Decl. Elliott, ¶ 9.)

12.  In Deputy Elliott's experience, when an inmate resists these instructions or is combative this suggests that he is hiding contraband; when the search is for a known weapon such as in this incident, resistance potentially poses a threat to safety and security of staff and inmates. (Decl. Elliott, ¶ 9.)

13.  Multiple cell inspections were completed at the Main Jail without incident on Wednesday January 6, 2021, during this C.E.R.T. operation, where deputies were met with the cooperation of the cell occupants who peacefully submitted to handcuffing.  (Decl. Elliott, ¶ 10; Decl. Cuneo, ¶ 11.)

14.  The inmates in 5 East cell 313 did not comply with orders.  As deputies were carrying out the search of other cells in the 300 pod, Sgt. Cuneo observed one of the occupants of 313 watching out of the cell window.  Sgt. Cuneo stood next to the door and ordered the inmate to step back from the window multiple times, but he did not comply.  (Decl. Cuneo, ¶ 12.)

15.  The search for weapons and other contraband in inmate Ackerson's cell was not done to harass or punish Mr. Ackerson.  (Decl. Cuneo, ¶ 13.)

16.  During the cell inspections on 5 East, Deputy Elliott heard Sgt. Cuneo request additional deputies to respond to cell 313.  (Decl. Elliott, ¶ 10; Exhibit E.)[2]

17.  At or about 2330 hours, 11:30 p.m., Deputy Butymhill was completing her search of her designated cell on 5 East in the 300 pod, when she heard Sgt. Cuneo give elevated commands from the other side of the pod.  (Decl. Butymhill, ¶ 5; Exhibit F.)

18.  Two inmates in cell 313 were being uncooperative and not following orders.  (Decl. Elliott, ¶ 10.)

19.  Pursuant to Deputy Elliott's training and orders, and in accordance with this operation, his goal was to quickly get the inmates handcuffed and removed from the cell, so that the cell could be searched for a contraband weapon.  (Decl. Elliott, ¶ 11.)

20.  Deputy Elliott did not initially respond to inmate Ackerson's cell with any intent to use force, and Sgt. Cuneo did not convey that force was necessary when Deputy Elliott entered the cell.  (Decl. Elliott, ¶ 11.)

21.  When it was time to search cell 313, Sgt. Cuneo instructed deputies to handcuff the two inmates, Ladarius Murphy and Elton Ackerson.  (Decl. Cuneo, ¶ 13.)

22.  Sgt. Cuneo did not believe that inmate Ackerson was at risk of any injury at all when the cell door was opened.  (Decl. Cuneo, ¶ 20.)

23.  Deputy Elliott directed inmate Ackerson to turn around and face the opposite direction, so that Elliott could handcuff him.  Inmate Ackerson remained facing Deputy Elliott and stated, "Fuck you!  You're not touching me, and I am not coming out of this cell."  (Decl. Elliott, ¶ 12; Exhibit E.)

24.  Deputy Elliott began to count backwards from five to one, to give inmate Ackerson time to comply.  (Decl. Elliott, ¶ 14; Decl. Cuneo, ¶ 15; Exhibit E.)

25.  Deputy Elliott took a step towards inmate Ackerson, and Ackerson then took a bladed stance and made fists with both hands.  (Decl. Elliott, ¶ 14; Decl. Cuneo, ¶ 15; Exhibit E.)

////

---

[2]  All references to exhibits are to defendants' exhibits submitted in support of their motion.

26.  Inmate Ackerson continued to use profanities and he refused to be handcuffed.  (Decl. Elliott, ¶ 14.)

27.  When Deputy Butymhill entered the cell, she observed Deputy Elliott trying to gain control of inmate Ackerson.  Inmate Ackerson was being physically combative with Deputy Elliott.  (Decl. Butymhill, ¶ 6; Exhibit F.)

28.  Deputy Butymhill rushed to assist in getting control of inmate Ackerson, to gain his compliance with handcuffing, and to remove Ackerson from the cell in order to facilitate the continued unit shakedown.  (Decl. Butymhill, ¶ 8.)

29.  Sgt. Cuneo entered cell 313 along with several deputies, and he observed the struggle to get both inmates handcuffed.  Sgt. Cuneo observed that inmate Ackerson refused to be handcuffed and was verbally belligerent.  (Decl. Cuneo, ¶ 14.)

30.  According to the Inmate Incident Report and investigation, inmate Murphy informed Sgt. Galovich that inmate Ackerson told the officers he would not be handcuffed.  (Exhibit G, p.3.)

31.  Deputy Elliott felt a sense of urgency to get inmate Ackerson's compliance without further delay, based upon the information that a shank was located somewhere in the 300 pod.  (Decl. Elliott, ¶ 15.)

32.  Inmate Ackerson escalated the interaction by his combative words and actions; Ackerson escalated the interaction with deputies when he refused to be handcuffed.  (Decl. Elliott, ¶ 15; Decl. Cuneo, ¶¶ 16.)

33.  Once inmate Ackerson took a fighting stance, Deputy Elliott lowered his center of gravity, grasped the back of Ackerson's knees, and applied pressure to his torso with his head to get Ackerson backwards off his feet and onto the bunk in the cell.  (Decl. Elliott, ¶ 16; Exhibit E.)

34.  Inmate Ackerson grabbed Deputy Elliott's facemask tight around Elliott's neck and was trying to choke him.  (Decl. Elliott, ¶ 17; Exhibit E; Exhibit F.)

////

////

35.  Deputy Butymhill observed that inmate Ackerson was actively pulling Deputy Elliott's facemask around Deputy Elliott's neck and throat as if trying to choke him.  (Decl. Butymhill, ¶ 9; Exhibit F.)

36.  Deputy Elliott struck inmate Ackerson on the right side of his face with a closed fist, which caused Ackerson to release Deputy Elliott's facemask.  Deputy Elliott used this force in self defense.  (Decl. Elliott, ¶ 18; Exhibit E.)

37.  Deputy Butymhill grabbed inmate Ackerson's arm to try and get control so he could be handcuffed.  Ackerson struck the left side of Deputy Butymhill's face with a closed fist.  His strike was intentional, not accidental.  The blow pushed her head back.  (Decl. Butymhill, ¶ 10; Exhibit F.)

38.  Deputy Elliott observed inmate Ackerson strike Deputy Butymhill (aka "Hill") in the face.  (Decl. Elliott, ¶ 19; Exhibit E.)

39.  Deputy Butymhill did not punch inmate Ackerson.  (Decl. Butymhill, ¶ 10.)

40.  Inmate Ackerson grabbed something that looked metallic, and he tried to strike Deputy Elliott with the object in his hand.  Deputy Butymhill grabbed Ackerson's hand and opened his fingers to remove a gold-colored metallic grill.  A grill is a metal mouthpiece.  She put the metal grill out of Ackerson's reach.  (Decl. Butymhill, ¶ 11; Exhibit F.)

41.  The physical confrontation in the cell unfolded very quickly, lasting for approximately two or three minutes.  (Decl. Elliott, ¶ 20.)

42.  The force used to get inmate Ackerson in handcuffs was necessary because he was combative, and due to the danger posed by the possibility of a hidden inmate weapon in the unit.  (Decl. Cuneo, ¶ 20; Decl. Elliott, ¶ 22.)

43.  Inmate Ackerson was secured in handcuffs.  Deputy Hill and Deputy Elliott removed Ackerson from the cell and seated him near central control.  Ackerson continued to be combative and failed to follow directives from deputies.  (Decl. Elliott, ¶ 21; Exhibit E.)

44.  Deputy Elliott was authorized to use reasonable force for the purpose of self-defense or defense of others.  (Decl. Cuneo, ¶ 17.)

////

9

1      45.  According to Sgt. Cuneo, all actions taken to gain inmate Ackerson's compliance

2  with handcuffing were necessary and reasonable.  Deputy Elliott did not use a weapon on

3  Ackerson.  Deputy Elliott used his hands in self-defense.  (Decl. Cuneo, ¶ 19.)

4      46.  Inmate Ackerson was escorted to the medical unit to be assessed by jail medical staff.

5  While waiting for medical staff, Ackerson turned his head to face Deputy Elliott and spit directly

6  into Deputy Elliott's eye from a close proximity.  (Decl. Elliott, ¶ 23; Decl. Cuneo, ¶ 21; Exhibit

7  A (video) at :34.)

8      47.  The Sergeant directed deputies to place inmate Ackerson on the ground.  Ackerson

9  was then placed on the ground face down, and a spit mask was placed on his head.  Ackerson

10  stated, "Good, I hope it did get you in your eye, you pussy, you fuckin' devil."  Another deputy

11  took over Deputy Elliott's position so that he could flush his eyes.  (Decl. Elliott, ¶ 24; Exhibit B

12  (video) at :37.)

13      48.  Deputy Elliott did not at any time use a Conducting Electrical Weapon, a "taser," on

14  inmate Ackerson.  (Decl. Elliott, ¶ 25.)

15      49.  Deputy Butymhill did not at any time use a Conducting Electrical Weapon, a "taser,"

16  on inmate Ackerson.  She did not deploy a taser at any time during the search on 5 East at the

17  Main Jail.  (Decl. Butymhill, ¶ 13.)

18      50.  Inmate Ackerson's Correctional Health medical records from the January 7, 2021

19  visit provide as follows:  "Patient brought to 2M after a fight; patient stable angry would not

20  answer questions or allow for nurse to assess or take VS [vital signs].  Patient appeared stable at

21  this time.  No visible wounds or injuries noted."  (Exhibit H.)

22      51.  During the medical encounter after the incident, deputies are heard informing medical

23  staff that inmate Ackerson had been tased with "just a dry stun."  (Exhibit C (video) at 3:34.)

24      52.  During the medical encounter after the incident, inmate Ackerson reported pain in his

25  face, around his mouth and eyes.  (Exhibit C (video) at 4:15-29.)

26      53.  The actions of deputies in gaining compliance from inmate Ackerson on January 6,

27  2021, were within the Sheriff's Department's Use of Force Policy.  The policy permits force in

28  cases of self-defense, defense of others, and to prevent the destruction of evidence.  In Sgt.

1    Cuneo's opinion, it was reasonable for Deputy Elliott to believe that the force he used was

2    necessary because inmate Ackerson was belligerent and combative, and because of the concern

3    about the potential for an inmate weapon nearby.  (Decl. Cuneo, ¶ 22; Exhibit I.)

4         54.  The actions of deputies in conducting the shakedown on January 6, 2021, were within

5    the Sheriff's Department's policy governing inspections and organized searches.  (Decl. Cuneo, ¶

6    23; Exhibit J.)

7         55.  On January 11, 2021, Sgt. Galovich conducted a discipline hearing for inmate Elton

8    Ackerson.  (Decl. Galovich, ¶ 2; Exhibit G.)

9         56.  Sgt. Galovich reviewed a report from Deputy Ray, who was present in cell 313 and

10   witnessed inmate Ackerson's refusal to comply with Deputy Elliott's instructions to turn around

11   to be handcuffed.  Deputy Ray's report included the following:  Ackerson balled his fists and

12   took a bladed stance as if preparing to fight; Deputy Elliott tackled Ackerson into the lower

13   bunk; Ackerson struck Deputy Hill in the mouth with a closed fist.  (Decl. Galovich, ¶ 4; Exhibit

14   G.)

15        57.  Sgt. Galovich spoke with inmate Murphy who was inmate Ackerson's cellmate and

16   was present during the incident.[3]  (Decl. Galovich, ¶ 6; Exhibit G.)

17        58.  Based upon a review of the reports and based upon interviews,  Sgt. Galovich found

18   inmate Ackerson guilty of assault and battery on staff and Ackerson was disciplined with 15 days

19   full restriction.  (Decl. Galovich, ¶ 7; Exhibit G.)

20        59.  Inmate Ackerson had no prior interactions with any of the deputies involved in this

21   lawsuit.  (Pl.'s Dep. at 15:7-12.) (Exhibit K.)

22        60.  Inmate Ackerson insisted in his deposition that Deputy Hill tased him; he also

23   testified that she was "punching" him on the back of his head.  (Pl.'s Dep. at 10:7-8, 14:10-14,

24   16:23-17:2, 19:7-11, 27:8-11; and see ECF No. 14 at 3 (First Am. Complt.).

25   ////

26   _____

27   [3]  In his incident report, Galovich documented his interview with plaintiff's cellmate Murphy who
     heard Ackerson tell officers he would not be handcuffed and according to Murphy, Ackerson was
     yelling and resisting officers while being handcuffed.  Id.  No party submitted a declaration by
28   inmate Murphy.

1  61.  Inmate Ackerson later changed his deposition testimony to acknowledge that it was

2  not Deputy Hill who tased him, but rather nonparty Deputy Arcineda.[4]  (ECF No. 41-5 at 64, 66.)

3  62.  Inmate Ackerson did not appeal the administrative decision which imposed 15 days

4  restriction for his assault on staff.  (Pl.'s Dep. at 26:20-23.)

5  V.  The Parties' Evidence

6  A.  Defendants' Evidence

7  Defendants provided the following evidence:

8  1.  Declarations of defendants (ECF Nos. 41-6, 7 & 8);

9  2.  Declaration of Sgt. Galovich, Sacramento Sheriff's Department (ECF No. 41-9);

10  3.  Declaration of defendants' counsel (ECF No. 41-4);

11  4.  Flash drive with video footage taken on January 6, 2021, from the Sacramento County

12  Jail of (a) the medical entrance; (b) plaintiff and deputies at the medical entrance; and (c) plaintiff

13  and deputies beginning at the medical entrance and continuing to a medical visit.

14  5.  Investigative report number SD 2021-5908 (ECF No. 41-5 at 5-24 (Exhibit D));

15  6.  Defendant Elliott's report (ECF No. 41-5 at 26-27 (Exhibit E));

16  7.  Report by defendant Hill (nka Butymhill) (ECF No. 41-5 at 29 (Exhibit F));

17  8.  Inmate incident report regarding plaintiff's violation of a Main Jail rule prohibiting

18  assault and battery on staff (ECF No. 41-5 at 31-33 (Exhibit G));

19  9.  Excerpt of plaintiff's correctional health records, along with a declaration from the

20  custodian of records (ECF No. 41-5 at 35-37 (Exhibit H));

21  10.  Sheriff's Department's General Order and Use of Force Policy for the Main Jail in

22  effect on January 6, 2021 (ECF No. 41-5 at 39-44 Exhibit I));

23  11.  Sheriff's Department's Operations Order for Inspections and Organized Searches

24  ("Shakedowns") for the Main Jail in effect on January 6, 2021 (ECF No. 41-5 at 46-49 (Exhibit

25  J)); and

26  ////

27

28  [4]  In his amended complaint, plaintiff states that Deputy Arcineda held plaintiff down, but
plaintiff did not name Arcineda as a defendant.  (ECF No. 14.)

1    12.  Excerpts from plaintiff's September 27, 2022 deposition, and his corrections thereto.

2  (ECF No. 41-5 at 51-67 (Exhibit K)).

3        B.  Plaintiff's Evidence

4       Aside from his verified amended complaint, plaintiff provided two oppositions signed

5  under penalty of perjury.  (ECF Nos. 14, 44 & 53.)  The court considers as evidence those

6  portions of the amended complaint and oppositions that are based on plaintiff's personal

7  knowledge.  See Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (citations omitted).

8  VI.  Discussion

9        A.  Failure to Address Undisputed Facts

10       As argued by defendants, despite being provided contemporaneous Rand notice, plaintiff

11  failed to address their statement of undisputed facts, arguing instead that defendants violated

12  plaintiff's human rights and subjected plaintiff to "brutality" in violation of the Eighth

13  Amendment.  (ECF No. 44 at 2.)  Further, he contends defendants are ethically and morally

14  bound to seek "truth and justice and not turn a blind eye to injustice where it's convenient to do

15  so," and contests every word defendants assert to dismiss plaintiff's claims.  (Id.)

16       Federal Rule of Civil Procedure 56(c)(1)(A) requires that "a party asserting that a fact . . .

17  is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the

18  record. . . ."  Id.; see also Local Rule 260(b).  Plaintiff's generalized and conclusory statements in

19  his opposition are insufficient.

20       However, it is well-established that the pleadings of pro se litigants are held to "less

21  stringent standards than formal pleadings drafted by lawyers."  Haines v. Kerner, 404 U.S. 519,

22  520 (1972) (per curiam).  Nevertheless, "[p]ro se litigants must follow the same rules of

23  procedure that govern other litigants."  King v. Atiyeh, 814 F.2d 565, 567 (9th Cir. 1987),

24  overruled on other grounds, Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc).

25  That said, an inmate's choice to proceed without counsel "is less than voluntary" and is subject to

26  "the handicaps . . . detention necessarily imposes upon a litigant," such as "limited access to legal

27  materials" as well as "sources of proof."  Jacobsen v. Filler, 790 F.2d 1362, 1364-65 & n.4 (9th

28  ////

13

1    Cir. 1986).  Therefore, prisoners should not be held to a standard of "strict literalness" with

2    respect to the requirements of the summary judgment rule.  Id.

3         Further, the Ninth Circuit has cautioned that district courts are to "construe liberally

4    motion papers and pleadings filed by pro se inmates and should avoid applying summary

5    judgment rules strictly."  Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  The non-

6    moving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [his]

7    favor . . . . [his] version of any disputed issue of fact is thus presumed correct."  Eastman Kodak

8    Co. v. Image Technical Services, Inc., 504 U.S. 451, 456 (1992) (internal quotation marks

9    omitted).  Accordingly, the court considers the record before it in its entirety despite plaintiff's

10   failure to comply with the applicable rules.  However, only those assertions which have

11   evidentiary support in the record are considered.

12        B.  Alleged Excessive Force

13        Plaintiff alleges that after he was handcuffed and on the ground, defendant Elliott punched

14   plaintiff in the face and head, and defendant Butymhill tased plaintiff multiple times, in violation

15   of the Eighth Amendment.

16              Governing Standards

17        The use of excessive force by a prison official violates the Eighth Amendment.  Hudson v.

18   McMillian, 503 U.S. 1 (1992).  Determining whether there has been an Eighth Amendment

19   violation turns upon "'whether force was applied in a good faith effort to maintain or restore

20   discipline or maliciously and sadistically for the very purpose of causing harm.'"  Id. at 6

21   (quoting Whitley v. Albers, 475 U.S. 312, 320-21 (1986)).

22        To determine whether the use of force violates the Eighth Amendment, the court should

23   consider the "extent of injury . . ., the need for application of force, the relationship between that

24   need and the amount of force used, the threat 'reasonably perceived by the responsible officials,'

25   and 'any efforts made to temper the severity of a forceful response.'"  Hudson, 503 U.S. at 7

26   (quoting Whitley, 475 U.S. at 321).  The extent of injury suffered by the plaintiff may indicate the

27   amount of force applied.  Wilkins v. Gaddy, 559 U.S. 34, 37 (2010).

28   ////

14

1

2

3

4

5

> [N]ot "every malevolent touch by a prison guard gives rise to a federal cause of action." "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. ¶ Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts.

6    Id. at 37-38 (quoting Hudson, 503 U.S. at 9).

7         Excessive force cases often turn on credibility determinations, and "[the excessive force

8    inquiry] 'nearly always requires a jury to sift through disputed factual contentions, and to draw

9    inferences therefrom.'"  Smith v. City of Hemet, 394 F.3d 689, 701 (9th Cir. 2005) (alteration in

10   original) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)).  Therefore, "'summary

11   judgment or judgment as a matter of law in excessive force cases should be granted sparingly.' "

12   Id.  The Ninth Circuit has "held repeatedly that the reasonableness of force used is ordinarily a

13   question of fact for the jury."  Liston v. County of Riverside, 120 F.3d 965, 976 n.10 (9th Cir.

14   1997) (citations omitted).

15                    Discussion

16        Importantly, it is undisputed that plaintiff was uncooperative and combative on January 6,

17   2021.  Plaintiff was found guilty of assault and battery on staff and was disciplined with 15 days

18   full restriction.  (UDF 58.)  Plaintiff did not appeal the disciplinary conviction.  (UDF 62.)  Thus,

19   there was a need for the application of force.

20        Further, it is now undisputed that defendant Butymhill did not tase plaintiff.  While

21   defendant Butymhill rushed into plaintiff's cell to assist defendant Elliott in his efforts to subdue

22   plaintiff, plaintiff does not allege that defendant Butymhill punched plaintiff in the head or face,

23   or otherwise used excessive force.  Defendant Butymhill declares that she did not punch plaintiff.

24   (UDF 39.)  Thus, plaintiff's claim as to defendant Butymhill fails as a matter of fact and law.

25        As for defendant Elliott's alleged use of excessive force, plaintiff must show that

26   defendant Elliott applied the force maliciously and sadistically to cause harm rather than in a

27   good-faith effort to maintain or restore discipline.  Hudson, 503 U.S. at 6.  Here, the evidence

28   does not demonstrate a malicious or sadistic use of force.  Rather, the evidence demonstrates that

1  defendant Elliott was acting to restore order in response to the actions of plaintiff.  "The infliction

2  of pain in the course of a prison security measure . . . does not amount to cruel and unusual

3  punishment simply because it may appear in retrospect that the degree of force authorized or

4  applied for security purposes was unreasonable, and hence unnecessary in the strict sense."

5  Whitley, 475 U.S. at 319.  It is undisputed that defendant Elliott did not use a taser on plaintiff;

6  rather, Elliott used his hands to subdue and gain control of plaintiff in an incident that lasted two

7  or three minutes.  Plaintiff adduced no evidence rebutting defendant Elliott's evidence that he

8  used reasonable force in a good faith effort to restore discipline.  In addition to addressing

9  plaintiff's lack of compliance, all of the defendants were also faced with the danger posed by the

10  possibility of a hidden inmate weapon in the unit, a legitimate security concern.  Thus, the need

11  for use of force, and the threat reasonably perceived by defendants all weigh in favor of summary

12  judgment.  Similarly, following plaintiff's failure to follow orders, defendants Hill and Butymhill

13  also tempered their use of force by using only their hands; it is undisputed that neither defendant

14  tased plaintiff.

15        The extent of plaintiff's alleged injuries also weighs in favor of summary judgment.

16  Plaintiff provided no medical evidence to support the injuries claimed in his verified pleading.

17  When he arrived at medical, video shows plaintiff standing against a wall, and no injuries to his

18  face are readily apparent.  (Exhibit A, 00-32).  After the spit mask was applied, plaintiff walked to

19  the nurse's station.  The video shows plaintiff told the registered nurse he had pain in his face,

20  specifically around his eyes and mouth.  (Exhibit C, 4:15-29)  But the registered nurse

21  documented that plaintiff appeared stable and no visible wounds or injuries were noted.  (ECF

22  No. 41-5 at 36.)  The video confirms that plaintiff appeared stable.  The lack of documented

23  injuries supports a finding that the amount of force used by defendant Elliott, as well as defendant

24  Butymhill, was proportional given plaintiff's resistance.

25        In order to defeat summary judgment, plaintiff bears the burden of setting forth specific

26  facts in support of his contention that a dispute exists as to whether force was applied maliciously

27  and sadistically to cause harm.  Plaintiff failed to do so; rather he simply claims his human rights

28  were violated and he was subjected to brutality.  (ECF No. 44 at 2.)  The verified allegations in

16

1   his amended complaint are insufficient to demonstrate that either defendant acted with a culpable

2   state of mind under all of the circumstances.  By contrast, the incident reports state both plaintiff

3   and his cellmate Murphy were resisting.  (ECF No. 41-5 at 13, 15-24.)  Deputy Ray's incident

4   report notes plaintiff struck Deputy Hill "one time in the mouth with a closed fist."  (ECF No. 41-

5   5 at 32.)  And, as noted above, plaintiff was subsequently convicted of assaulting staff.  (UDF

6   58.)

7          Thus, the undersigned concludes that this is one of those rare cases where summary

8   judgment is appropriate.  Plaintiff failed to come forward with any competent evidence to rebut

9   defendants' evidence.  The evidence submitted on summary judgment reflects that plaintiff was

10   non-compliant with officers' orders, was combative and resistive, requiring defendants Elliott and

11   Butymhill to use reasonable force in a good faith effort to restore discipline, and resulting in de

12   minimis injury.  See Wilkins, 559 U.S. at 38.  On this record, the undersigned finds that all of the

13   Hudson factors weigh in favor of summary judgment.  Id., 503 U.S. at 7.

14          Accordingly, because plaintiff fails to demonstrate, by competent evidence, that there

15   remains a triable issue of material fact as to whether defendants Hill or Butymhill used excessive

16   force, such defendants are entitled to summary judgment.

17          C.  Alleged Failure to Protect

18          Plaintiff alleges that defendant Cuneo failed to protect plaintiff by opening plaintiff's cell

19   door on January 6, 2021, deliberately creating the physical encounter.  In his deposition, plaintiff

20   testified that there "would have never been no physical encounter or anything if the sergeant

21   never opened the door."  (Pl.'s Dep. at 17.)  Plaintiff claims that defendant Cuneo "went out of

22   his way to retaliate against our assigned cell."  (ECF No. 14 at 4.)

23          A "failure to protect" claim under the Eighth Amendment requires a showing that "the

24   official [knew] of and disregard[ed] an excessive risk to inmate. . . safety."  Farmer v. Brennan,

25   511 U.S. 825, 837 (1994).  Because "only the unnecessary and wanton infliction of pain

26   implicates the Eighth Amendment," evidence must exist to show the defendant acted with a

27   "sufficiently culpable state of mind."  Wilson v. Seiter, 501 U.S. 294, 297 (1991) (internal

28   quotation marks, emphasis and citations omitted).  Under an Eighth Amendment failure to protect

17

1    claim, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question

2    of fact subject to demonstration in the usual ways, including inference from circumstantial

3    evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from

4    the very fact that the risk was obvious."  Farmer, 511 U.S. at 842 (citations omitted).  The duty to

5    protect a prisoner from serious harm requires that prison officials take reasonable measures to

6    guarantee the safety and wellbeing of the prisoner.  Id. at 832-33; Frost v. Agnos, 152 F.3d 1124,

7    1128 (9th Cir. 1998).

8            Here, plaintiff adduced no evidence to support his claim that defendant Cuneo acted with

9    a culpable state of mind.  Indeed, plaintiff testified that he had no prior interaction with any of the

10   defendant deputies prior to the January 6, 2021 incident.  (UDF 59.)  Also, plaintiff fails to rebut

11   defendants' evidence that the C.E.R.T. deputies were lawfully engaged in a shakedown based on

12   a legitimate security concern -- that a homemade weapon or "shank" was located somewhere

13   within the 300 pod of 5 East, where plaintiff was housed.  The search and cell inspections in the

14   300 pod of 5 East were necessary for the safety and security of the jail, including the safety and

15   security of staff and inmates, including plaintiff.  (UDF 5.)  Multiple cell inspections were

16   completed without incident during the C.E.R.T. operation on January 6, 2021, where inmates

17   cooperated with the deputies and peacefully submitted to handcuffing.  (UDF 13.)  Plaintiff

18   adduced no evidence that defendant Cuneo acted with a culpable state of mind in opening

19   plaintiff's cell door on January 6, 2021, and defendant Cuneo is entitled to summary judgment.

20           D.  Qualified Immunity

21           Because defendant Cuneo did not fail to protect plaintiff by opening his cell door on

22   January 6, 2021, the court does not reach defendant Cuneo's claim of qualified immunity.

23           E.  Additional Allegation

24           Finally, in his amended opposition, plaintiff requests that the court review video footage

25   from when officers first entered the pod to confront plaintiff.  (ECF No. 53.)  Plaintiff claims the

26   footage of officers walking to the cell will depict what provoked the initial contact and show the

27   officers violating plaintiff's human rights and show that they were in fact the ones who first

28   ////

1  provoked and attacked plaintiff, causing him to react accordingly, and to conclude that the

2  incident reports were fabricated.

3      In response, defendants contend that plaintiff again fails to demonstrate a triable issue of

4  fact and does not identify where to locate such event in the record.  Plaintiff does not indicate that

5  any of the named defendants were among the "officers" who allegedly violated plaintiff's human

6  rights before reaching his cell and is conclusory because it fails to identify specific conduct by a

7  specific defendant.  Further, plaintiff's argument is speculative because the alleged conduct took

8  place prior to the officers reaching plaintiff's cell, and he fails to state he has personal knowledge

9  of such conduct or demonstrate how he is aware of such alleged conduct.  (ECF No. 54 at 3.)

10      Defendants' arguments are well-taken.  Plaintiff's effort to ascribe some nefarious motive

11  to unidentified officers who approached his cell on January 6, 2021, is unsupported by competent

12  evidence.  Defendants adduced evidence that the C.E.R.T. team was conducting a shakedown to

13  locate an unlawful weapon made by inmates which was required for the safety and security of the

14  jail, as well as the staff and inmates.  (UDF 1-2, 4, 5.)  Plaintiff submits no competent evidence in

15  rebuttal and fails to demonstrate that he had personal knowledge about the shakedown or what

16  took place when "officers" first entered the pod.[5]  Because plaintiff's arguments are unsupported

17  by competent evidence, there is no need to view video footage of what took place at the time

18  officers entered the pod and walked to plaintiff's cell, even if such video existed.  Plaintiff's

19  speculation as to why the unidentified officers approached his cell is insufficient to demonstrate a

20  material dispute of fact exists as to his Eighth Amendment claims against defendants Hill,

21  Butymhill and Cuneo.

22  ////

23

24  [5]  After review of the record, it appears that plaintiff believes the officers had no right to enter his
25  cell on January 6, 2021.  However, prisoners have no legitimate subjective expectation of privacy
   in their cells.  "[T]he Fourth Amendment proscription against unreasonable searches does not
26  apply within the confines of the prison cell."  See Hudson v. Palmer, 468 U.S. 517, 525-26
   (1984); Robins v. Lamarque, 2007 WL 1241956, at *2 (N.D. Cal. Apr. 27, 2007).  "The
27  recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled
   with the concept of incarceration and the needs and objectives of penal institutions."  Hudson v.
28  Palmer, 468 U.S. at 526.

19

1     F.  Conclusion

2         For all of the above reasons, the undersigned recommends that defendants' motion for

3     summary judgment be granted.

4     VII.  Further Leave to Amend

5         It is unclear when plaintiff learned that it was Deputy Arcineda who tased plaintiff.  At his

6     September 27, 2022 deposition he testified it was defendant Butymhill who tased plaintiff and did

7     not correct such testimony until November 14, 2022.  But the record shows that at the time he

8     filed the amended complaint, plaintiff was aware of Arcineda's presence during the January 6,

9     2021 incident.  The January 6, 2021 incident report clearly identifies Deputy Arcineda as the

10    officer who tased plaintiff.  (ECF No. 41-5 at 13.)  Plaintiff should have obtained such report

11    during discovery; discovery was extended twice at plaintiff's request and closed on January 6,

12    2023.  Finally, the pretrial motions deadline expired on April 27, 2023, yet plaintiff did not move

13    to amend his complaint to name Deputy Arcineda.  Thus, because plaintiff failed to timely move

14    to amend, the undersigned declines to recommend that plaintiff be granted leave to amend to do

15    so at this late stage of the proceedings.

16    VIII.  Conclusion

17        Accordingly, IT IS HEREBY ORDERED that plaintiff's unauthorized opposition (ECF

18    No. 59) is disregarded and the Clerk of the Court shall strike such opposition; and

19        IT IS RECOMMENDED that defendants' motion for summary judgment (ECF No. 41) be

20    granted, and this action be terminated.

21        These findings and recommendations are submitted to the United States District Judge

22    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

23    after being served with these findings and recommendations, any party may file written

24    objections with the court and serve a copy on all parties.  Such a document should be captioned

25    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

26    objections shall be filed and served within fourteen days after service of the objections.  The

27    ////

28    ////

20

1  parties are advised that failure to file objections within the specified time may waive the right to

2  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  Dated:  January 22, 2024

4

5  _____
   KENDALL J. NEWMAN
   UNITED STATES MAGISTRATE JUDGE

6

   acke2205.msj

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28